UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARIO DRAKES, | No. C 08-2686 SI (PR) |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| JERRY BROWN, Attorney General of the State of California; CHUCK ROSA, Warden, La Palma Correctional Center, | |
| Respondents. | |

**INTRODUCTION**

This is a federal habeas corpus action filed by a state prisoner pursuant to 28 U.S.C. § 2254. For the reasons set forth below, the petition is denied.

**BACKGROUND**

In 2005, an Alameda County Superior Court jury convicted Petitioner of stalking, first degree residential burglary, two counts of assault with a firearm, misdemeanor assault, misdemeanor battery, misdemeanor battery against a person who is the parent of Petitioner's child, and making criminal threats. The jury also found that Petitioner had personally used a firearm in the commission of the assault. The trial court sentenced Petitioner to a total term of sixteen years and four months in state prison. Petitioner appealed. The California Court of Appeal for the First Appellate District affirmed the judgment. (Ans., Ex. M at 2.) The California Supreme Court denied Petitioner's petition for review. (Id., Ex. Q.)

Evidence presented at trial shows that Petitioner committed multiple offenses against his former girlfriend, Lena Taylor, over a one-week period in March 2004:

[On March 15th], Taylor and her sister, Marlo Stewart, were returning to Taylor's apartment complex. [Petitioner] still had the keys to Taylor's unit. They were on their way to see their mother, who also lived in the complex, when [Petitioner] came out of Taylor's apartment. [Petitioner] was shouting angrily, calling her a "bitch" and saying "I'm going to fuck you up." He tried to pull Taylor into her apartment. While struggling, [Petitioner] punched Taylor in the chest with a closed fist. She got loose and went to her mother's apartment. [Petitioner] continued yelling angrily from the outside and kicked the security door to Taylor's mother's apartment, denting it. Taylor and Stewart also testified that they saw [Petitioner] brandishing a gun during this episode, and then heard gunshots when [Petitioner] went out of sight.

. . . .

[On March 16th] Taylor was on her way to the hardware store to purchase new locks for her apartment. In the parking lot, [Petitioner] suddenly appeared and opened the driver's side door. He pushed Taylor over and got in. Taylor grabbed her phone to call the police, and [Petitioner] grabbed her phone and got out of the car. He walked away, yelling.

. . . .

[On March 20th] the police came to Taylor's apartment in response to another call from her. The officer listened to some messages on Taylor's voice mail, featuring an angry male voice. Taylor testified that in some of the messages, [Petitioner] stated that he was going to kill her and that he was going to shoot her in the head if he saw her with anyone else. The officer advised Taylor to save the recording. Taylor did not have the recording at the time of trial and admitted that she couldn't remember the messages "word for word."

. . . .

[On March 22nd] Taylor was asleep in her bed with Jerome Taylor (no relation). Her children were in their bedroom. They awoke suddenly to the sound of the bedroom window breaking. They saw flashes from a gun and then heard the sound of two gunshots. At trial, Taylor testified that the shooter was leaning in through the window with his upper body, and that she recognized [Petitioner's] face. She testified that [Petitioner] stated that he was going to kill her, pointed the gun at her, and then fired several shots.

When the police arrived, they found two bullet holes in Taylor's bedroom. Both were on the side of the room opposite the broken window. Police interviewed Taylor, Jerome Taylor and Lena Taylor's neighbor across the street, Jerold Serrell, who heard glass breaking and witnessed the shooting. Neither Jerome Taylor nor Jerold Serrell could identify [Petitioner] as the shooter.

(Ans., Ex. M at 2–4.)

As grounds for federal habeas relief, Petitioner claims that: (1) the imposition of the aggravated prison terms violated his Sixth and Fourteenth Amendment rights; (2) the use of

2

uncharged aggravating sentencing factors did not comply with the constitutional guarantees of notice and due process; (3) the findings in aggravation created aggravated crimes that were void for vagueness under the Due Process Clause; (4) the prosecutor violated his right to a jury composed of a fair cross-section of the community; (5) the exclusion of bad act evidence about the victim violated his Confrontation Clause right; (6) the prosecutor committed misconduct; (7) defense counsel rendered ineffective assistance; and (8) there was cumulative error.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412–13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

3

A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

**DISCUSSION**

**I.   Imposition of Aggravated Prison Terms**

Petitioner claims that the trial court violated his Sixth Amendment rights by imposing the aggravated, or upper, term for assault with a firearm and the attendant personal use enhancement.[1] Specifically, Petitioner contends that the imposition of the upper term was based on aggravating sentencing factors that were not submitted to a jury, nor found beyond a reasonable doubt. (Pet., P. & A. at 9.) The state appellate court rejected this claim, finding that the selection of the upper term was constitutional because the jury "expressly found" at least one aggravating factor true "beyond a reasonable doubt." (Ans., Ex. M at 25.)

During trial, the prosecutor submitted a document entitled "Aggravated Term Notification" in which he declared that he was seeking imposition of the upper term of imprisonment. (Id., Ex. A at 143). In this document, the prosecutor stated that he would present evidence of six aggravating sentencing factors, one of which was that the victim was particularly vulnerable. In its verdict on the assault charge at issue here, the jury explicitly found true the aggravating factor that the victim was particularly vulnerable. (Id., Ex. A at 260.)

Petitioner bases his claim on a Supreme Court case, Apprendi v. New Jersey, 530 U.S. 466 (2000), and its progeny. In Apprendi, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490. The "statutory maximum" discussed in Apprendi is the maximum sentence a judge could impose based solely on the facts reflected in the jury verdict or admitted by the defendant; in other words,

---

[1] Petitioner also claims that imposition of this term violated his right to due process. (Pet., P. & A. at 9.) The Court addresses this due process claim below.

4

the relevant "statutory maximum" is not the sentence the judge could impose after finding additional facts, but rather the maximum he could impose without any additional findings. Blakely v. Washington, 542 U.S. 296, 303–04 (2004).

In a later case, the Supreme Court applied the above reasoning to California's determinate sentencing law ("DSL"). The Court found such sentencing scheme violated the Sixth Amendment because the DSL allowed the sentencing court to impose an elevated, or upper, sentence based on aggravating facts that the trial court found by a preponderance of the evidence, rather than facts found by a jury beyond a reasonable doubt. Cunningham v. California, 549 U.S. 270, 274 (2007). According to the Supreme Court, "the middle [prison] term prescribed by California statutes, not the upper term, is the relevant statutory maximum." Id. at 288. A trial court can permissibly impose the upper term only if the aggravating circumstances are either admitted by the defendant, or submitted to the jury and found true beyond a reasonable doubt. See id. at 284.

In California, the existence of a single aggravating factor is a sufficient basis to impose the upper term. People v. Osband, 13 Cal.4th 622, 728 (Cal. 1996) (citation removed).

Applying these legal principles to the instant matter, the Court concludes that Petitioner's Sixth Amendment claim is without merit. In accordance with the constitutional requirements of Apprendi and Cunningham, the allegation of the aggravating factor of a particularly vulnerable victim was submitted to the jury, which found the allegation true beyond a reasonable doubt. Per Osband, cited above, the existence of that factor was sufficient for the trial court to impose the upper term. Accordingly, Petitioner has not shown that his Sixth Amendment rights were violated. The Court, then, denies Petitioner's claim.

## II.     Aggravating Factors

Petitioner claims that aggravating factors were not properly charged, nor were they properly explained to the jury, violating his right due process and to a jury trial. (Pet., P. & A.

5

at 12.)[2] Specifically, Petitioner alleges that the aggravating factors were not charged in the information, nor, when the factors were charged through the submission of the notification, were they tied to any particular charge. (Id. at 12–14.) The state appellate court rejected Petitioner's claim:

> We reject [Petitioner's] claim that his "sentence for an aggravated crime, where the aggravated crime was not charged [in the charging documents] violated [Petitioner's] right to notice and due process under the Sixth and Fourteenth Amendments." As [Petitioner] acknowledges, during the trial, the prosecutor submitted a document entitled "Aggravated Term Notification," which alleged factors in aggravation including victim vulnerability. Certainly this document apprised defense counsel of the trial court's sentencing choices and placed him on notice that victim vulnerability was a possible factor the court could consider in aggravation.

(Ans., Ex. M at 25 n. 10.)

A criminal defendant has a right to be informed of the criminal charges against him through a charging document, so that he had can prepare a defense to the charges. See Gautt v. Lewis, 489 F.3d 993, 1004 (9th Cir. 2007).

Petitioner has not shown support for his claim that the aggravating factors must be charged in the information. Aggravating factors are not criminal charges, but rather "facts which justify the imposition of the upper prison term." Cal. Rule of Court 4.405(d); Cunningham, 549 U.S. at 278. For example, one of the aggravating factors — that a victim was "particularly vulnerable" — is not a crime or a criminal charge, but a fact a trial court considers in its sentencing calculus. Because aggravating factors are not criminal charges, Petitioner has not shown that they must appear in the information or indictment.[3]

---

[2] Petitioner also contends that he failed to receive reasonable notice of the aggravating factors. (Pet., P. & A. at 13.) This contention is flatly contradicted by the record. Petitioner received reasonable notice of the charges, consonant with due process, when the prosecutor submitted the aggravated circumstances document to the court and to the defense seven days before the end of trial.

[3] Petitioner, relying on Apprendi, claims that the circumstances in aggravation are "equivalent to elements of a crime." (Pet., P. & A. at 13.) According to Petitioner, the trial court has no authority to submit these judicially-created "elements" to a jury because only the state legislature has the authority to create crimes and elements on which a jury may be instructed. (Id.) Petitioner misinterprets the law. First, the Apprendi court stated that the relevant inquiry

6

1  As to the second part of Petitioner's claim, Petitioner has not shown that he has a federal
2 constitutional right to have aggravating factors tied to specific criminal charges. Also, even if
3 Petitioner had such a clearly established right, such a right was protected because the factors were
4 attached to specific charges in the verdict form. (Ans., Ex. A at 247–266.)

Accordingly, Petitioner's claim is denied.

### III.  Constitutional Vagueness

Petitioner claims that the aggravating factors, being elements of aggravated crimes, must define the criminal offense "with sufficient definiteness" in order to comply with due process. Petitioner contends that because the aggravating factors were not defined in accordance with due process notions of fairness and notice, they are constitutionally void for vagueness. (Pet., P. & A. at 15.)

Petitioner's claim is without merit. First, these aggravating factors are not criminal offenses, nor elements of any crime. Rather, they are facts relating to the crime, the victim, or the defendant which a trial court can use in determining a sentence. See Cal. Rules of Court 4.421 & 4.423. Because they are not criminal offenses, Petitioner's assertion that they are void for vagueness fails. Second, the Supreme Court found that these same factors "are similar to the federal sentencing policies set forth in 18 U.S.C. § 3553(a) (2000 ed. and Supp. IV), which directs a court to consider, among other things, the need to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public." Cunningham, 549 U.S. at 304 n.6. Because similar factors are cited with approval by the Supreme Court, and Petitioner has not cited any persuasive authority to the contrary, the

---

is not of form — such as whether something is an element of a crime — but of effect: "does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict." 530 U.S. at 494. Second, though it is true that these "aggravating circumstances" are, as Petitioner puts its, "a judicial creation," it is also true that the California legislature authorized and directed California's judicial council to adopt rules guiding the sentencing judges decision to impose the lower or upper prison term. See Cunningham v. California, 549 U.S. 270, 278 (2007). So, even if these circumstances were elements of some sort, the legislature granted authority to the judicial council to create them.

7

Court must deny his claim that such factors are unconstitutional. Accordingly, Petitioner's claim is denied.[4]

## IV.  Batson Claim

Petitioner claims that the prosecutor's exercise of one his peremptory challenges violated Petitioner's Sixth Amendment right to an impartial jury drawn from a representative cross-section of the community. (Pet., P. & A. at 19.) Petitioner contends that a comparative jury analysis demonstrates the truth of his claim. (Id. at 23.)

The state appellate court summarized the relevant facts as follows:

> After the prosecutor had exercised six peremptory challenges, and the defense had exercised eight peremptory challenges, both sides passed. The court was about to swear in the jury, which included Sandra B., when three jurors raised hardship concerns. After exploring each juror's hardship request, the court excused one of the jurors. The prosecutor then used two of his remaining peremptory challenges to excuse Sandra B. and another juror.
>
> After the prosecutor excused Sandra B., the defense objected on Wheeler[5] grounds, saying "I see no reason for him to excuse her. He already accepted her at one point . . . And I don't see any other reason other than her membership in that protected class [African-American women] that she's being excused from the jury."
>
> The court found a prima facie case and the prosecutor provided the following reasons for exercising a peremptory challenge to excuse Sandra B.: "With respect to Ms. [B.], after Mr. [T.] got kicked, got excused for cause, I did not like the make-up of the jury. It had nothing to do with her being African American at all. I'm African American myself. I do not have a problem. In fact, she might have been good for me. But I did not like her responses when I look [sic] at them again. When she was asked about reasonable doubt, she was most definitely if I didn't prove my case. [Sic.] She was just emphatic about her answers."
>
> The prosecutor went on to explain, "I didn't have a problem with her at first. Once Mr. [T.] was gone . . . I didn't like Ms. [B.] It had nothing to do with her being African American whatsoever."

---

[4] Petitioner also contends that the holding of People v. Black, 41 Cal.4th 799 (2007) conflicts with the holding of Cunningham v. California, 549 U.S. 270, 274 (2007). This conflict, Petitioner claims, violates his right to a jury trial and to due process. (Pet., P. & A. at 17.) Whatever the possible merit of this claim, the Court has already concluded that Petitioner's federal constitutional rights under Cunningham were not violated.

[5] In California, a party who believes his opponent is using his peremptory challenges to strike jurors on grounds of group bias alone may raise the point by way of a timely motion under People v. Wheeler, 22 Cal. 3d 258, 280 (1978).

8

> The court asked, "What did it have to do with?" The prosecutor replied that "she might be too strong of a personality for this jury. There has to be some leaders and there has to be some followers . . . [¶] I thought Ms. [B.] might have been too strong a personality, period. And her answering the defense questions the way she did, that kind of swung me and I kicked her. It has nothing to do with her being African American.["] The prosecutor also pointed out that he had left one African American on the jury. The court denied [Petitioner's] motion.

(Ans., Ex. M at 5–6.)

After a consideration of these facts, the state appellate court rejected Petitioner's claim:

> Clearly the trial judge, who had the opportunity to observe the demeanor of this juror, was in the best position to evaluate such a complex, nuanced, observation-based justification for excusing this prospective juror. Moreover, we have no way of assessing the demeanor of the other prospective jurors as they answered similar questions posed by counsel. In short, the cold record cannot overcome the credibility determination made by the trial court.

(Id. at 7.)

The use of peremptory challenges by either the prosecution or defendant to exclude cognizable groups from a petit jury may violate the Equal Protection Clause. See Georgia v. McCollum, 505 U.S. 42, 55-56 (1992). In particular, the Equal Protection Clause forbids the challenging of potential jurors solely on account of their race. See Batson v. Kentucky, 476 U.S. 79, 89 (1986). Batson permits prompt rulings on objections to peremptory challenges pursuant to a three-step process. First, the defendant must make out a prima facie case that the prosecutor has exercised peremptory challenges on the basis of race "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." Id., 476 U.S. at 93–94. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Id. at 97; Wade v. Terhune, 202 F.3d 1190, 1195 (9th Cir. 2000). Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. Batson, 476 U.S. at 98; Wade, 202 F.3d at 1195. A federal habeas court need not dwell on the first step of the Batson analysis if the matter has proceeded to the second or third step. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima

9

facie showing becomes moot." Hernandez, 500 U.S. at 359.

To fulfill its duty, the court must evaluate the prosecutor's proffered reasons and credibility in light of the totality of the relevant facts, using all the available tools including its own observations and the assistance of counsel. Mitleider v. Hall, 391 F.3d 1039, 1047 (9th Cir. 2004). In evaluating an explanation of racial neutrality, the court must keep in mind that proof of discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. See Hernandez v. New York, 500 U.S. 352, 355–62 (1991). It also should keep in mind that a finding of discriminatory intent turns largely on the trial court's evaluation of the prosecutor's credibility. Rice v. Collins, 546 U.S. 333, 340–42 (2006).

The findings of the state trial court on the issue of discriminatory intent are findings of fact entitled to the presumption of correctness in federal habeas review, see Purkett v. Elem, 514 U.S. 765, 769 (1995), as are the findings of the state appellate court. See Mitleider, 391 F.3d at 1050); Williams v. Rhoades, 354 F.3d 1101, 1108 (9th Cir. 2004). Under AEDPA, this means that a state court's findings of discriminatory intent are presumed sound unless a petitioner rebuts the presumption by clear and convincing evidence. Miller-El v. Dretke, 545 U.S. 231, 240 (2005) (citing 28 U.S.C. § 2254(e)(1)). A petitioner must show that the state court's conclusion is "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." Id. (citing 28 U.S.C. § 2254 (d)(2)). A federal habeas court may grant habeas relief only "if it was unreasonable to credit the prosecutor's race-neutral explanations for the Batson challenge." Rice, 546 U.S. at 338–41.

Applying these legal principles to the instant matter, the Court concludes that Petitioner has not rebutted the presumption that the state court's conclusion was an unreasonable one. The Court need not consider the first step of the Batson analysis, because the prosecutor offered the racially-neutral explanation that Sandra B.'s strong personality would exercise undue control over other jurors, and because the trial court ruled on the ultimate question of intentional discrimination. With respect to the second Batson step, the Court finds nothing in the record that would support a finding that the prosecutor's decision was based on constitutionally offensive

1 considerations. As the state appellate court found, the prosecutor's stated reasons were based in
2 large part on observations of the juror's physical demeanor in court. Because the transcript
3 contains only the words spoken in court, this Court must defer to the prosecutor's description of
4 the jurors' physical behavior. As to the third <u>Batson</u> step which queries whether there was
5 intentional discrimination, Petitioner has not shown clear and convincing evidence to rebut the
6 presumption that the trial court's determination was correct, or shown why this Court should
7 favor Petitioner's interpretation of the record over the trial court's credibility determination.

8 A comparative juror analysis does not change this Court's conclusion. First, Petitioner
9 nowhere indicates the race of the other jurors.[6] Without such evidence, this Court cannot
10 determine whether the prosecutor exercised his peremptory strikes in a way that offends the Equal
11 Protection Clause. Second, the prosecutor relied not only on Sandra B.'s answers, but also on
12 her physical demeanor. On that point, the transcript contains no description of the other jurors'
13 demeanor, let alone whether their demeanor was similar to Sandra B.'s. Also, Petitioner does not
14 dispute the prosecutor's description of Sandra B.'s demeanor. Taking all these facts into
15 consideration, the Court concludes that Petitioner has not shown evidence that non-African-
16 American jurors who were similar to Sandra B. in their demeanor and in their responses, were
17 treated differently. Without such evidence, this Court must deny Petitioner's <u>Batson</u> claim.

### V.    Exclusion of Bad Act Evidence

Petitioner claims that the trial court violated his rights under the Confrontation Clause when it excluded testimonial evidence of specific instances in which the victim, Lena Taylor, had lied. (Pet., P. & A. at 25.) At trial, Petitioner sought to introduce such evidence through the testimony of two witnesses:

> The first witness was Christine Hoang, who was Taylor's social worker in December 2004 and January 2005. The defense represented that Taylor had lied to Hoang about not using drugs because she tested positive for cocaine during those months. The second witness proffered by the defense was a police officer

---

[6] According to the prosecutor, there was only one African-American remaining on the jury. (Ans., Ex. M at 6.)

11

> who had arrested Taylor for driving under the influence. During the arrest, Taylor told the officer that she had not been drinking, but her blood-alcohol test results showed a blood-alcohol level of .21 percent. The court excluded the testimony of both witnesses based on the failure to "articulate[ ] sufficient foundation."

(Ans., Ex. M at 9.) The state appellate court rejected Petitioner's claim, finding that the trial court

> acted within its discretion by refusing to permit [Petitioner], in effect, to conduct a trial within a trial on Taylor's lies to authorities about her illegal drug and alcohol abuse, particularly in the absence of any evidence directly connecting the lies with her testimony at trial. A trial court must remain sensitive to the risk of using valuable judicial time in the proof of such collateral matters.

(Id. at 10.)

"State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (quotations and citations omitted). The exclusion of evidence does not violate the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." Montana v. Egelhoff, 518 U.S. 37, 42 (1996). "While the Constitution prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." Holmes, 547 U.S. at 325–26.

The state's latitude is limited, however, by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments, which include the right to confront the witnesses and evidence adduced against the accused. See Holmes, 547 U.S. at 324. To this end, the Confrontation Clause serves purposes of ensuring that witnesses will testify under oath, forcing witnesses to undergo cross-examination, and permitting the jury to observe the demeanor of witnesses. U.S. v. Medjuck, 156 F.3d 916, 919 n.1 (9th Cir. 1998).

In California, "impeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present. Hence, courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value." People v. Wheeler, 4 Cal. 4th 284, 296–297 (Cal. 1992) (footnote omitted). California Evidence Code section 352 "empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." (Id. at 296.)

Applying these legal principles to the instant matter, the Court cannot say that the state appellate court's ruling was resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law. First, the ruling did indeed avoid an undue consumption of time. If Petitioner's witnesses had testified, the prosecutor would have been entitled not only to cross-examine them, but to call rebuttal witnesses, or present other evidence undercutting the witnesses' credibility. The presentation of this evidence likely would have consumed a great deal of time. Under the broad latitude this Court must accord California lawmakers, the Court concludes that the trial court's exclusion of the witnesses' testimony was a decision reasonably taken in order to avoid an undue consumption of trial time.

Second, Petitioner was not denied his right to confront Taylor and attempt to impeach her credibility, even though he was denied the opportunity to call his credibility witnesses. Relevant to this, the Court notes that the Confrontation Clause guarantees an opportunity for effective cross examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. See Delaware v. Fensterer, 474 U.S. 15, 20 (1985). Here, the record indicates that defense counsel closely cross-examined Taylor, challenged the accuracy of her recollections, and attempted to impugn her credibility. (Ans., Ex. S, Vol. 2 at 253–75.) Although Petitioner was denied his impeachment witnesses, he was allowed to examine Taylor on the facts of the case. On this record, the Court must deny Petitioner's claim.

**VI.   Alleged Prosecutorial Misconduct**

Petitioner claims that the prosecutor violated his right to due process when he committed misconduct in five ways, which the Court will describe and address below. (Pet., P. & A. at 28.)

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." Darden v. Wainwright, 477 U.S. 168, 181 (1986). Under Darden, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness. Tan v. Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005). A prosecutorial misconduct claim is decided "on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process." Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995) (citation and quotation marked omitted).

**A.   Burden of Proof**

Petitioner claims that "the prosecutor improperly shifted the burden of proof to the defense," in violation of Petitioner's due process right to require the prosecutor to prove his guilt beyond a reasonable doubt. (Pet., P. & A. at 28.) The state appellate court summarized the facts underlying this claim as follows:

> In the prosecutor's closing argument, he extensively discussed [Petitioner's] alleged alibi and argued the witnesses who testified about the alibi were not credible. The prosecutor argued, 'There is no reasonable doubt here. There is no other conclusion that you can reach based on the [Petitioner's] case, based on what was presented to you by those defense witnesses. That's not reasonable doubt. That testimony lacks all credibility. The defense was phony, false, fabricated and a work in progress.'

(Ans., Ex. M at 14.) The state court did not see this as an instance of misconduct: "Rather . . . the prosecutor was simply commenting on the weakness of the evidence supporting [Petitioner's alibi]." (Id. at 15.)

Petitioner has not shown that the prosecutor committed misconduct. The record supports the state court's reading of the passage that the prosecutor was commenting on the defense evidence, and was not shifting its evidentiary burden. Also, the trial court had instructed the jury that the prosecution had the burden to prove Petitioner's guilt beyond a reasonable doubt.

14

Nothing in the above-quoted passage contradicts or even works against those instructions. Accordingly, Petitioner's claim is denied.

### B.      Alleged Vouching

Petitioner claims that prosecutor committed misconduct by vouching for prosecution witnesses. (Pet., P. & A. at 31.) The specific comments were that (1) Marlo Stewart, Taylor's sister, had "no reason to lie . . . She's telling the truth"; (2) Jerome Taylor didn't know Petitioner, so "why would he lie?"; (3) Lena Taylor had "no reason to lie here . . . [there was] [n]o credible defense testimony that she lied"; and (4) Lena Taylor "could have been making up all kinds of stuff, but she didn't. She was consistent. The only thing she has done wrong was her choice of men. That's the only thing she has done wrong." (Id.)

Improper vouching for the credibility of a witness occurs when the prosecutor places the prestige of the government behind the witness or suggests that information not presented to the jury supports the witness's testimony. United States v. Young, 470 U.S. 1, 7 n.3, 11–12 (1985); United States v. Parker, 241 F.3d 1114, 1119–20 (9th Cir. 2001).

Petitioner has not shown that the prosecutor engaged in improper vouching. In none of the quotations above did the prosecutor use the prestige of the government, or suggest he was privy to information withheld from the jury that supports the witness's testimony. Rather, the prosecutor attempted to assure the jury that his witnesses were telling the truth, despite defense attempts to discredit them. The state appellate court rejected Petitioner's claim on similar grounds. It found that such comments were "merely responsive to defense counsel's own arguments." (Ans., Ex. M at 16.) It also found that under California law, a "prosecutor may assure the jury of a witness's apparent honesty or reliability based on matters in the record." (Id.) This Court cannot say that such a determination resulted in a violation of Petitioner's constitutional rights. Accordingly, Petitioner's claim is denied.

### C.     Facts in Opening Statement

Petitioner claims that the prosecutor committed misconduct by misstating evidence in his opening statement. (Pet., P. & A. at 32.) The state appellate court rejected Petitioner's claim, finding that even if the prosecutor committed misconduct, "such misconduct was nonprejudicial in light of the properly introduced evidence at trial," and the jury had been admonished not to regard statements by the prosecutor as evidence. (Ans., Ex. M at 18.)

The relevant facts are as follows. In his opening statement, the prosecutor stated that Jerold Serrell, the victim's neighbor and witness to the events of March 22nd, "saw [Petitioner] on top of that fence." The prosecutor also stated that "I don't know what [Serrell] is going to say when he gets in here because he's scared." Contrary to the prosecutor's assertion, Serrell testified at trial that he could not identify Petitioner as the shooter, and that he (Serrell) never purported to tell anyone the identity of the shooter. (Id.) In his closing argument, the prosecutor stated that Serrell "says I can't identify anyone. That's what he says. He offers that up before anybody asked him that question. 'I can't identify anyone.' Well then why are you scared? Because he knows who did it." Defense counsel objected, but the trial court overruled the objection, and issued this admonition to the jury: "Ladies and gentlemen, this is called closing argument for a reason, because the attorneys have a chance to argue the law and the facts. Remember that the lawyers don't decide the facts. That's your job exclusively. Consider this as argument. If you don't agree or see it the way the attorneys argue, that's your job and your responsibility." (Id. at 17.)

The prosecutor also said that Serrell in his testimony "never identified [Petitioner]. He never came in here and said [Petitioner] was the one that was out there." Immediately following these statements, the prosecutor contended, "The inference can be drawn from his conduct and his testimony that maybe he does know," at which time defense counsel raised on objection. The trial court overruled the objection, saying, "That's for the jury to decide." (Id. at 17–18.)

The first factor in determining the prejudicial effects of misconduct is whether the trial court issued a curative instruction. When a curative instruction is issued, a court presumes that

16

the jury has disregarded inadmissible evidence and that no due process violation occurred. See Greer v. Miller, 483 U.S. 756, 766 n.8 (1987). This presumption may be overcome if there is an "overwhelming probability" that the jury would be unable to disregard evidence and a strong likelihood that the effect of the misconduct would be "devastating" to the defendant. Id. at 766 n.8.

Here, the Court concludes that even if the prosecutor's committed misconduct, such alleged misconduct was not prejudicial. First, the trial court instructed the jury that statements by the attorney are not evidence. (Ans., Ex. M at 17; Ex. S, Vol. 2 at 352.) The Court must presume that the jury disregarded the prosecutor's statements, per the trial court's instructions. Second, in his closing argument, the prosecutor plainly stated that Serrell never identified Petitioner as the shooter, thereby undercutting his previous assertion that Serrell saw Petitioner on the fence. The Court concludes that the admonition and the prosecutor's statements acted as a corrective to whatever possible harm the allegedly improper statements inflicted. On this record, the Court must deny Petitioner's claim.[7]

## VII. Effectiveness of Trial Counsel

Petitioner claims that defense counsel rendered ineffective assistance when he failed to object to the above-listed and other comments by the prosecutor, and failing to make some investigations. (Pet., P. & A. at 33–34.) In addition to the above-listed comments, Petitioner contends that defense counsel failed to object to: (1) the prosecutor's statement that the defense counsel did not investigate Jerome Taylor, who had a "shady" background; and (2) the

---

[7] Petitioner also claims that the prosecutor committed misconduct by shifting the evidentiary burden to Petitioner when he asserted that Taylor's testimony was consistent with the police reports. Such an assertion, Petitioner contends, asked the jury to presume Taylor's credibility unless the defense could prove that Taylor had made prior inconsistent statements. Petitioner also contends that the prosecutor improperly challenged defense counsel's use of Taylor's taped statement to police. (Pet., P. & A. at 29–30.) Petitioner's claims are without merit. The record indicates that these alleged instances of misconduct were in fact the prosecution's permissible responses to arguments raised by defense counsel. Accordingly, Petitioner's claims are denied.

17

prosecutor's "exploitation of the exclusion of Lena Taylor's past lies." Petitioner also contends that defense counsel failed to renew his objection to the "prosecutor's attack on the integrity of defense counsel."

The state appellate court rejected Petitioner's claim that defense counsel rendered ineffective assistance when he did not object to the instances of alleged prosecutorial misconduct: "Because we find the prosecutor's remarks about which [Petitioner] complains did not prejudice his case, we necessarily reject his alternative contention that his trial counsel was ineffective for failing to object to and request admonitions to the jury regarding the alleged misconduct." (Ans., Ex. M at 17.)

Claims of ineffective assistance of counsel are examined under Strickland v. Washington, 466 U.S. 668 (1984). In order to prevail on a claim of ineffectiveness of counsel, a petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. Id. at 687–68. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. Where the defendant is challenging his conviction, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695. It is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the Strickland test if the petitioner cannot even establish incompetence under the first prong. See Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998).

Here, Petitioner has not shown that defense counsel rendered ineffective assistance. First, as to the instances of alleged prosecutorial misconduct addressed in Section VI of this order, the Court has concluded that, with one possible exception, the prosecutor did not commit misconduct. As to that one possible exception, the Court has already determined that the trial court's

admonitions cured any possible harm.  Because Petitioner has not shown that any prejudicial misconduct occurred, he has not shown that but for defense counsel's failure to object, there was a reasonable possibility that the outcome would have been different.

As to defense counsel's alleged failure to object to the other comments, the Court concludes that Petitioner has not established that he suffered any prejudice.  Specifically, the evidence of Petitioner's guilt was strong — in particular, the testimony of Lena Taylor and her sister, Marlo Stewart as to the events of March 15th, a police officer as to the events of March 20th, and the witnesses to the events of March 22nd.  So, even if defense counsel failed to object to the prosecutor's comments, the great weight of the evidence heavily undercuts any contention that but for some alleged errors, the outcome of the proceedings would have been different. Accordingly, Petitioner's claim is denied.

**VIII.  Cumulative Error**

Petitioner claims that the combined effect of the errors at trial resulted in a conviction that violates due process.  (Pet., P. & A. at 35.)

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned.  See Alcala v. Woodford, 334 F.3d 862, 893–95 (9th Cir. 2003) However, where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation.  See Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002).

Petitioner has not shown that several errors existed, let alone that a combination of such errors resulted in a constitutionally invalid conviction.  The sole error which may have occurred — the prosecutor's misstatement in his opening argument of what Serrell saw on March 22nd — was found to have not resulted in prejudice to Petitioner.  No other errors existing, the Court finds no evidence to support Petitioner's claim.  Accordingly, Petitioner's claim is denied.

**CONCLUSION**

The Court concludes that the state appellate court's adjudication of the claims did not

result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts. Accordingly, the petition is DENIED.

The Clerk shall enter judgment in favor of Respondents, and close the file.

**IT IS SO ORDERED.**

DATED: 11/18/09

SUSAN ILLSTON
United States District Judge